UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o

| | | |
|---|---|---|
| ALTA FOX OPPORTUNITIES FUND, LP, | : | Case No. __4:25-cv-4017_____ |
| Plaintiff, | : | |
| v. | : | **VERIFIED COMPLAINT** |
| DAKTRONICS, INC., and REECE A. KURTENBACH, | : | |
| Defendants. | : | |

o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o

Plaintiff, Alta Fox Opportunities Fund, LP ("Alta Fox" or "Plaintiff"), brings this Verified Complaint on behalf of itself directly, and, in the alternative, derivatively on behalf of Daktronics, Inc. ("Daktronics" or the "Company"), seeking equitable relief against Defendants Daktronics and Reece A. Kurtenbach ("Kurtenbach") (collectively, "Defendants"). As set forth below, Alta Fox alleges as follows:

## PRELIMINARY STATEMENT

1. The Daktronics Board of Directors (the "Board") has engaged in nakedly self-serving actions against the interests of Daktronics' stockholders and Daktronics as a whole, all while directly targeting Alta Fox, Daktronics' largest stockholder. Alta Fox has a vision (and a plan) to improve the Board and the Company's governance, taking Daktronics to new heights— but the Board adamantly opposes Alta Fox's proposed reforms to increase profitability and shareholder returns. In a series of increasingly erratic and brazen moves, Board members have taken action to entrench themselves, reject needed reforms to the Company's governance, and

directly harm Alta Fox.  Now, the Board is on the precipice of forcing a vote to move Daktronics from South Dakota—where it has been continuously incorporated for **57 years**—and to reincorporate in Delaware, in order to undermine Alta Fox's specific voting rights and stockholder rights generally.  Bedrock South Dakota law mandates "cumulative voting"[1]—in effect, minority stockholders can pool their votes to ensure the election of at least some directors reflecting minority stockholder interests and prevent long-term entrenchment of weak directors.  The ***principal*** reason the Board has advanced for reincorporation in Delaware? ***Remove cumulative voting***.  The reason for this move, ***now***?  Just weeks before its proposed move to Delaware, Alta Fox publicly expressed its view that Daktronics would benefit from improved governance and new and stronger Board members—in the Board's mind, threatening their comfortable positions.  Even worse, as explained in more detail below, the Board took other protective measures so that Alta Fox ***could not*** call a special meeting to enact governance reforms before the Board's own proposal was announced.  The Board's self-interested moves to entrench themselves and prevent reform must be stopped now, before the Board can call a tainted vote on reincorporation and before Alta Fox suffers lasting and irreparable harm as a result, which harm will also, inevitably, be felt by Daktronics and all of its stockholders.

2.      To be clear, Alta Fox is aligned with the best interests of Daktronics (including other long-term Daktronics stockholders, like its employee 401(k) retirement program).  Daktronics makes exceptional, industry leading visual displays.  Daktronics supplies video displays to more than half of the teams in the National Football League and more than half of the teams in Major League Baseball, with many of the largest displays in both sports.  Alta Fox is deeply engaged in the Company's business and long term prospects.  And, as Daktronics' largest

---

[1] S.D. Const., art. XVII, § 5; SDCL § 47-1A-728.

shareholder who provided rescue financing at one of the Company's lowest points, Alta Fox has more skin in the game than anyone else. Indeed, Alta Fox holds an interest in approximately five times the number of shares held by the entire Board combined. And while Daktronics' share price presently hovers around $16 per share, Alta Fox wants to more than double the Company's value and take its stock price to $40.[2] As Alta Fox has repeatedly expressed for years, "[t]he reality is Alta Fox is fully aligned with all of Daktronics' stakeholders, including the many South Dakotans who depend on the Company to provide jobs and retirement plan security."[3]

3.      What hampers Daktronics, however, is its deeply entrenched and ineffective governance at the Board level. The Board is staggered (or classified) with directors serving three years terms, meaning only two or three of its eight directors are up for election at any given time—shielding leadership from meaningful shareholder oversight and entrenching legacy directors. At the next annual meeting, only two Board members are up for election. This lack of accountability, combined with other protectionist measures, has fostered complacency and strategic stagnation. For example, the Board has failed to set any specific medium or long-term financial targets, making it easier for management to evade scrutiny for poor performance. Moreover, the CEO's compensation is almost entirely cash-based (*i.e.*, he receives little equity compensation to align his interests with the Company's growth). Management's annual non-equity incentive target is based

---

[2] More information about Alta Fox's investment thesis, and Alta Fox's belief in Daktronics' prospects, can be found in an investor presentation dated December 10, 2024, attached hereto as <u>Exhibit A</u>. *See Fix Daktronics: The Alta Fox Path to $40/Share*, https://cdn.prod.website-files.com/6724d580a7ba92f1219c7de4/6759bd5d19c1d37a7a3642b5_Fix%20Daktronics%20-%20The%20Alta%20Fox%20Path%20to%20%2440%20Per%20Share.pdf.

[3] <u>Exhibit B</u>, BUSINESS WIRE, *Alta Fox Sends Letter to Daktronics' Independent Committee Regarding the Urgent Need for Governance Improvements, Leadership Changes and an Immediate and Certain Liquidity Solution*, https://www.businesswire.com/news/home/20230126005382/en/Alta-Fox-Sends-Letter-to-Daktronics%E2%80%99-Independent-Committee-Regarding-the-Urgent-Need-for-Governance-Improvements-Leadership-Changes-and-an-Immediate-and-Certain-Liquidity-Solution.

on operating margin thresholds, yet those thresholds have remained unchanged since 2012, despite significant changes in the business over that time.   And despite steering the Company to the brink of bankruptcy, failing to file SEC reports on time, and overseeing a period in which internal financial weaknesses were discovered, the same Chief Financial Officer (CFO) remains in place today.  The Board waited more than two years to announce a search for a replacement CFO— ignoring glaring red flags and multiple private letters from Alta Fox calling for a much-needed upgrade in this critical financial oversight role.  Further, while the Company's founder, Al Kurtenbach, passed leadership on to his son Defendant Kurtenbach more than a decade ago, and despite the Kurtenbach family holding a fraction of Daktronics' stock and thus lacking alignment with the stockholders as a whole, the founding family continues to exercise excessive influence. Three of the Company's five named executive officers, including the CEO, are related family members, raising serious concerns about nepotism, independence, and misaligned leadership priorities.

4.    In short, the Board needs to enact governance reforms to right the Company's trajectory.  Despite being the primary stockholder targeted by the Board, Alta Fox is not the *only* stockholder to call out Daktronics' need for reform—other major investors have begun clamoring for the necessary changes.  For example, Breach Inlet Capital, LP ("Breach Inlet"), an investment firm focused on underfollowed and misunderstood small cap equities (and a Daktronics shareholder), issued a press release "express[ing] [its] agreement with Alta Fox's stated concerns regarding the Company's leadership, governance practices, and incentives," and "remind[ing] the members of the Board that they have a fiduciary duty to all shareholders, not just the Kurtenbach

Family."[4]  Likewise, Anchor Capital Advisors, LLC, ("Anchor Capital"), has also spoken in favor of governance reforms and against the newly-proposed move to reincorporate in Delaware, writing:

> We believe the Company, and its stakeholders, would greatly benefit from adding shareholder-supported board members, who would bring fresh perspectives to help address Daktronics' undervaluation.  We would also support implementing a de-classified board structure in alignment with our proxy voting guidelines, and strong corporate governance.
>
> In our view, it is important that Daktronics remain incorporated in South Dakota at this time – and consider moving to Delaware at a later date – to allow for swift shareholder-driven governance enhancements.    As a firm, we believe reincorporating right now would diminish the voices of non-insider shareholders and stymie progress for positive changes backed by a number of top shareholders. We view the proposed enhancements mentioned above as highly beneficial to the Company, aligned with shareholders and essential to Daktronics' long-term success.[5]

5.    Alta Fox has made its proposed reforms clear: de-stagger the Board so stockholders can vote on all directors; elect new directors who will right the ship; and align the interests of the Board and senior management with stockholders.  But instead of engaging in (or even entertaining the possibility of) these reforms, on information and belief, the Board is trying to move Daktronics out of South Dakota so it can erode the stockholder power that has been the bedrock of the Company for over five decades. Critically, the Board is attempting to move Daktronics to Delaware and eliminate cumulative voting before Alta Fox is able to call a vote on its plan for reform.  That self-interested act—placing the Board member's jobs over the best interests of the Company and its shareholders—is a clear breach of fiduciary duty and constitutes shareholder

---

[4] Exhibit C, BUSINESS WIRE, *Breach Inlet Capital Issues Public Letter to Board of Daktronics*, https://www.businesswire.com/news/home/20241216340543/en/Breach-Inlet-Capital-Issues-Public-Letter-to-Board-of-Daktronics/ .

[5] Exhibit D, BUSINESS WIRE, *Anchor Capital Supports Governance Enhancements at Daktronics*, https://www.businesswire.com/news/home/20250127910426/en/Anchor-Capital-Supports-Governance-Enhancements-at-Daktronics.

oppression.  And that is precisely what this suit seeks to prevent:  This suit is necessary to prevent irreparable harm to Alta Fox, protect Daktronics, and ensure Daktronics' continued prosperity for decades to come.

## PARTIES

6.     Plaintiff Alta Fox Opportunities Fund, LP ("Alta Fox"), is, and at all relevant times has been, a Daktronics shareholder.  Alta Fox is a Delaware limited partnership based in Fort Worth, Texas, with no partners in South Dakota.  Alta Fox is Daktronics' largest stockholder—as of filing, it holds a beneficial interest in approximately 11.7% of Daktronics' stock, or 5,933,019 shares, which as of January 31, 2025, translated into a market value of approximately $97 million.

7.     Defendant Daktronics, Inc. is a South Dakota corporation with its principal place of business located in Brookings, South Dakota.  Daktronics is a world leader in designing, engineering, and manufacturing LED display technology and audio systems.

8.     Defendant Reece A. Kurtenbach is the President, Chief Executive Officer (CEO), and Chair of the Board of Directors for Daktronics.  On information and belief, Reece A. Kurtenbach resides in South Dakota.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because complete diversity exists between Plaintiff and Defendants, and the amount in controversy, including the benefit of the injunctive relief requested herein, exceeds $75,000.

10.     This Court has personal jurisdiction over the Defendants because they either reside within this District and/or engaged in conduct that had a substantial impact within this District.

11.     Venue is proper under 28 U.S.C. § 1391 because (1) a substantial part of the events or omissions giving rise to the claim asserted herein occurred in this District; and (2) Defendants

reside and/or conduct business in this District, and the Court has personal jurisdiction over Defendants in this District.

## FACTS

**A.    Daktronics, Inc. Becomes Leading Digital Display Company**

12.    According to Daktronics, the Company was founded as a South Dakota corporation on or about December 9, 1968, by two South Dakota State University engineering professors with a clear vision, ambition, and a garage in Brookings, South Dakota—where the startup Company began.  From its inception, Daktronics grew into a world leader in digital displays, and has been recognized as the world's largest supplier of large-screen LED video displays, as well as an international leader in dynamic audio communication systems, LED text and graphic displays, and related control systems.

13.    Although the Company began by making control systems for water treatment, Daktronics found an opening in the market for digital displays and jumped on the opportunity, reaching $1 million in annual sales by 1978 and at least 100 employees by 1979.

14.    Since then, Daktronics has become a well-known force in the digital display industry, designing and installing some of the world's largest and most iconic displays, including displays in New York's Times Square, London's Piccadilly Circus, and even in Olympic venues (debuting its Olympic displays at the 1980 Winter Olympics in Lake Placid, New York).  Upon information and belief, by 2017, Daktronics had installed the world's largest video scoreboard at the time in the Mercedes-Benz Stadium in Atlanta.  To date, Daktronics digital displays are installed in more than 120 countries.

15.     Over half of all National Football League stadiums use Daktronics' LED video displays.  So do half of all Major League Baseball parks, nearly half of all National Hockey League rinks, and 11 out of the 30 National Basketball Association arenas.

16.     Examples of Daktronics' world-renowned digital displays are included below:

 

 

17.     Since its founding in 1968, Daktronics has remained a South Dakota corporation with its principal place of business in Brookings, South Dakota.   Defendant Kurtenbach acknowledged that Daktronics is "the world leader in what [Daktronics] do[es], and it's sometimes hard for people to conceive that the company exists here in South Dakota in the Upper Plains."

However, there are "a lot of good things going on in [this] part of the world, and [Daktronics is] proud to be here."[6]

18.    Commenting on Daktronics' Sioux Falls location, Kurtenbach further announced Daktronics' plan to "continue to invest in space in Sioux Falls," due to Daktronics' belief that Sioux Falls "will continue to be part of [Daktronics'] winning strategy in the future."[7]

19.    Daktronics has grown into a worldwide business with over 2,500 employees, most of whom are employed right in Daktronics' home—in Brookings and Sioux Falls, South Dakota.

**B.    Daktronics Issues Going Concern Notice, and Alta Fox Steps in to Provide Desperately Needed Rescue Financing**

20.    Daktronics first began publicly trading on the NASDAQ under the national market symbol, DAKT, on February 10, 1994.  In September 2014, by the time the Company's founder, Al Kurtenbach, stepped down as Chairman and his son Defendant Kurtenbach took over, the Company had generated over $500 million in annual revenue and traded for over $13.00/share.

21.    Despite Daktronics' growing success and the expansion of the digital display industry, Daktronics began to significantly underperform reasonable projections after Defendant Kurtenbach took over as CEO, leading to stalled growth, weakened governance, and languished returns.

22.    During Defendant Kurtenbach's tenure (from 2014 to date), Daktronics' revenue has fallen from its 15% compound annual growth rate ("CAGR") with an average 7% earnings before interest and taxes ("EBIT") margin, as it was in 2014, prior to Defendant Kurtenbach

---

[6]    SIOUXFALLS.BUSINESS, *Daktronics at 50: Disruptive force, industry leader*, https://siouxfalls.business/daktronics-at-50-disruptive-force-industry-leader/.
[7] *Id.*

becoming CEO, to 4% CAGR with an average 3% EBIT margin.  That is, significantly slower growth and poorer earnings.

23.      By 2022, Alta Fox had become interested in investing in Daktronics.  Alta Fox is an investment management firm that "employs long-term-focused investment strategy to pursue exceptional risk-adjusted returns," with an emphasis on "driving shareholder value through [Alta Fox's] engagement with management teams and boards of directors."[8]  Alta Fox helps companies attain better performance through engagement with management and, when necessary, advocates for strong corporate governance and other reforms.

24.      After evaluating Daktronics' business and assessing its strong potential, Alta Fox began investing in the Company in July 2022.

25.      Signaling its dedication to Daktronics' growth and reform, Alta Fox visited Daktronics' Brookings headquarters in September 2022 in an attempt to convince the Board that operational improvements and financial discipline were required for the Company's growth.  Alta Fox additionally offered to increase its investment in Daktronics should Daktronics need additional capital.

26.      Despite Daktronics desperately needing such capital, Daktronics' Board failed to follow up with Alta Fox on its investment offer, and wholly disregarded Alta Fox's operational and financial recommendations for improvements.

27.      Months later, in a Form 8-K dated December 6, 2022, filed with the SEC, and in a complete surprise to Alta Fox and other shareholders, Daktronics disclosed that the Company's auditors issued "doubt about their ability to operate as a going concern."[9]  The Company further

---

[8] Exhibit E, FIXDAKTRONICS, *About Alta Fox*, https://www.fixdaktronics.com/about-alta-fox.
[9] Exhibit F, DAKTRONICS, December 6, 2022 Form 8-K,

disclosed it had discovered a "material weakness relating to the lack of adequate and appropriate financial reporting and disclosure related to such determination." (Ex. F.)  As a result, Daktronics delayed the filing of its quarterly financial statements on Form 10-Q.

28.     Daktronics' stock fell 50% in just a matter of days after this release.  At this point, Daktronics' stock was distressed, trading at less than $2.00 per share, and had hit a 20-year low.[10] In a further attempt to help rescue the Company from the Board's self-created financial downfall, Alta Fox made private offers to the Board to provide critical rescue financing to shepherd Daktronics through this period of troubled waters, demonstrating Alta Fox's unwavering commitment during a period of distress.  (*See* Ex. B.)  Alta Fox also continued to invest directly in Daktronics' stock, becoming the Company's largest individual shareholder by January 2023, holding over 5% of its stock.

29.     Although Daktronics needed Alta Fox's rescue funding, the Board repeatedly resisted Alta Fox's governance and financial reform strategies.  In order to negotiate a potential financing, the Board required, and Alta Fox agreed to, a Standstill and Voting Agreement (the "Standstill") that limited Alta Fox's ability to exercise certain stockholder rights or solicit votes of stockholders, including on potential governance reforms, for over a year.[11]

---

https://www.sec.gov/ix?doc=/Archives/edgar/data/0000915779/000091577922000097/dakt-20221205.htm.

[10] The <$2.00 per share amount represented a decline of over 80% from the price of Daktronics' stock when Defendant Kurtenbach first took over as Chairman, demonstrating a dramatic decline over an 8-year period.  In contrast, the S&P 500, a widely followed barometer of the stock market overall, increased by over 129% during the same time period.

[11] Exhibit G, Daktronics, March 20, 2023 Form 8-K, https://www.sec.gov/ix?doc=/Archives/edgar/data/0000915779/000091577923000022/dakt-20230319.htm.

30.     Alta    Fox,    however,    continued    providing    constructive,    best-practice recommendations to the Board during the duration of the Standstill.  Ultimately, the Standstill ran for 16-months, expiring in September 2024.

31.     On May 11, 2023, Alta Fox and Daktronics agreed to financing to support Daktronics, with Daktronics issuing a Senior Secured Convertible Note (the "Note") to Alta Fox.[12] Under the Note, Alta Fox provided Daktronics with $25 million in cash to support its operations. The loan matures in May 2027, and in the interim, Daktronics must make certain interest payments to Alta Fox for the loan.

32.     The Note is convertible, meaning that Alta Fox (or, in certain circumstances, Daktronics) can exchange some of the $25 million face value of the Note for a set number of shares.  There are limitations to the conversion right, however.  In particular, the Note provides that if Alta Fox holds above a defined "Maximum Percentage" of shares, then the Company *cannot* convert the Note, and the Company risks default for violating that provision.

33.     Defendant Kurtenbach commented on the new capital offered by Alta Fox, stating: "We . . . appreciate that Alta Fox has demonstrated its confidence in Daktronics' path forward by committing additional capital to the Company.  Alta Fox has been a collaborative partner and we thank them for their support."  (*See* Ex. H.)

## C.    Alta Fox Recommends Governance Reform to Increase Accountability and Efficiency, but Daktronics' Board Retaliates in Response

34.     On June 5, 2024, Alta Fox sent a private letter to the Board's Lead Independent Director, outlining governance concerns with the Company, the need for a new CFO, and the need

---

[12] A copy of Daktronics' press press release describing Alta Fox's rescue financing through the Note is attached hereto as Exhibit H.  Additional details, including a copy of the actual transaction documents associated with the Note, were filed as exhibits to the Form 8-K issued by the Company on the same day.

for "refreshment" of the Board with shareholder-appointed directors. The Board failed to respond to the letter and did not address Alta Fox's stated concerns.

35. On September 5, 2024, Alta Fox again sent a private letter—this time to the entire Board—outlining governance and managerial concerns with the Company. The Board did not provide any substantive feedback on this letter, but agreed that Board members Kurtenbach and Andrew Siegel would meet with Alta Fox. During the meeting, however, it was clear to Alta Fox that Kurtenbach and Siegel had no intention of implementing Alta Fox's recommended reforms.

36. Instead, just a few weeks later, Daktronics announced a plan to begin forcibly converting the Note as of November 11, 2024. This maneuver came without warning to Alta Fox—it, like everyone else, learned about Daktronics' plan from the public press release. Referencing discussions with the Board, the press release cited reduced interest payments as one of the reasons for the move.[13]

37. However, at the time of this announcement, Alta Fox owned ***more*** Daktronics shares than the Maximum Percentage. Because Alta Fox already owned in excess of the Maximum Percentage, as both parties acknowledged, Daktronics' attempted forced conversion was invalid. Alta Fox advised Daktronics that its purported conversion violated the plain terms of the Note and asked that the Company withdraw the conversion.

38. Presumably at the Board's behest, Daktronics nonetheless plowed forward and issued a Notice of Forced Conversion to Alta Fox on November 11, 2024, claiming to convert a portion of the Note into 1,109,350 shares of Daktronics in violation of the Note's terms. According to the Company, because Alta Fox already held more shares than the Maximum Percentage, the

---

[13] Exhibit I, *Daktronics Announces Intention to Convert $25 Million Convertible Promissory Note into Common Stock*, https://investor.daktronics.com/news-releases/news-release-details/daktronics-announces-intention-convert-25-million-convertible.

Company improperly intended to treat the Note as converted (and so not pay interest), but **also** not issue the shares associated with that conversion.

39.     Following the Board's continued lack of engagement with Alta Fox, on November 11, 2024, Alta Fox requested a questionnaire from the Board so that it could prepare a request for a special meeting of shareholders.

40.     Upon information and belief, feeling threatened at the possibility of a shareholder meeting to discuss governance reform, and in response to Alta Fox's request to withdraw the forced conversion notice, on November 19, 2024, the Board caused Daktronics to reduce its pre-existing poison pill[14] threshold, from 20% to 15%, further entrenching the Board.  That same day, Daktronics' stock fell by over 5%.  The lowering of the poison pill threshold defeated Alta Fox's ability to call a special meeting prior to the Note being converted.  Under Daktronics' bylaws, a shareholder must hold more than 10% of the total outstanding shares to call a special meeting. Until converted, the shares Alta Fox stood to obtain under the Note do not count towards the 10% meeting threshold but **do** count toward the poison pill threshold.  Alta Fox owned about 4.2% of the Company's stock outright, with additional ownership of approximately 7.5% of the Company's shares as part of the unconverted Note (for a fully diluted total of about 11.7%).  To obtain the shares necessary to call for a special meeting, Alta Fox thus still would have needed to acquire an additional 6.8% of the Company.  But, even assuming that route was available to Alta Fox, doing so would have only created a different problem:  If Alta Fox purchased shares on the open market to cross the 10% meeting threshold, its total ownership would **exceed 17% and trigger the poison**

---

[14] A "poison pill" refers to a corporate action that heavily disincentivizes the accumulation of stock in a company beyond a specified maximum stake.  Practically speaking, poison pills set a ceiling on how many shares any particular stockholder can acquire and limits the ability of minority stockholders to exercise influence on a company.

*pill*.  By the Board's action, Alta Fox was now stuck—it could not call a meeting prior to conversion of the Note.

41.     In connection with that action, Daktronics issued a press release inaccurately recounting Alta Fox's discussions concerning the Note with the Company, specifically targeting South Dakota's cumulative voting statute, and claiming Alta Fox's interests "may not be aligned with other Daktronics shareholders."[15]  The press release also inaccurately characterized private discussions between Alta Fox's and Daktronics' advisors concerning the Note.[16]

42.     Additionally, recognizing that it had exhausted all avenues for an amicable resolution with the Board, and to minimize the damage to Alta Fox from the purported forced conversions, on November 25, 2024, Alta Fox notified Daktronics that it was raising the Maximum Percentage to 14.99%.[17]  That new Maximum Percentage became effective on January 25, 2025, and Alta Fox began taking possession of the converted shares.  Under the terms of the Note, Daktronics can only convert a portion of the Note at a time.  Assuming Daktronics continues to convert on the schedule it has publicly promised (*see* Ex. I), the Note will be fully converted on March 5, 2025.

---

[15] Exhibit J, Daktronics, *Daktronics, Inc. Amends and Extends Shareholder Rights Agreement*, https://investor.daktronics.com/news-releases/news-release-details/daktronics-inc-amends-and-extends-shareholder-rights-agreement.

[16] For instance, the press release incorrectly claimed Alta Fox had "demanded" Daktronics provide $79 million in value to Alta Fox and misleadingly suggested the proper comparison was the $25 million face value of the Note.  Alta Fox made no "demands," nor is Daktronics required to take any specific action "demanded" by Alta Fox concerning the Note.  And because the Note is convertible, comparing its market value to its face value is senseless.  In December 2024, for instance, *just* the value of the shares that could be converted from the Note had a market value of over $77 million—and if Alta Fox succeeds in improving Daktronics, that value will be even higher.

[17] The percentage is no accident.  The Note allows the Maximum Percentage to be raised as high as 20%.  But because the Board caused the Company's poison pill threshold to lower to 15%, Alta Fox noticed a revised Maximum Percentage consistent with that threshold.

43.    Other shareholders noticed Daktronics' growing public resentment toward Alta Fox.  For example, in a press release published on December 17, 2024, shareholder Breach Inlet urged Daktronics to "immediately stop fighting with [Daktronics'] shareholders," and to stop "wasting shareholder capital in a public feud with its largest investor," Alta Fox, which Breach Inlet characterized as "the firm that potentially saved [Daktronics] from bankruptcy." (Ex. C.)

**D.    Alta Fox Continues Trying to Improve Daktronics and Publishes Presentation of Constructive Proposals**

44.    Despite the attempts to smear Alta Fox's public standing, Alta Fox remains a committed believer in the potential of Daktronics and its business.  Alta Fox also continues to believe, however, that the Company needs strong reforms at the Board level to reach its potential.

45.    On December 10, 2024, Alta Fox published a presentation outlining a path forward to increasing Daktronics' stock from $18.27 toward upwards of $40 per share. (*See* Ex. A.)  That presentation highlights Daktronics' high-quality growth business:

① DAKT IS A HIGH-QUALITY AND SECULAR GROWTH BUSINESS, SEVERELY UNDERVALUED BY THE MARKET TODAY

## About Daktronics

Daktronics is a manufacturer of electronic scoreboards and large screen video displays for sporting, commercial and transportation applications. The company was founded in 1968 and has been public since 1994. The company is known for making the highest quality products due to exceptional engineering prowess. This has led to Daktronics being the market share leader in nearly all its end markets. The company is based in Brookings, South Dakota and at the time of Alta Fox's position initiation, had zero sell side analyst coverage and a ~$200M market cap.

**Key Financial Metrics[1]**

|  | 12/9/24 |
|---|---|
| Stock Price | $18.27 |
| FDSO (including convert) | 51.7M |
| **Market Cap** | **$944.6M** |
| Cash | $134.4M |
| Debt (excluding convert) | $14.6M |
| **Enterprise Value** | **$824.8M** |

**FY26 Multiples[2]**

| FY26 Valuation Metrics | 4/30/2026 |
|---|---|
| PE (+) net cash/share | 11.7x |
| EV/EBITDA | 7.5x |



The Original Matside Scoreboard



Intuit Dome Halo Board

(*See* Ex. A, at 8.)

46.    Moreover, Alta Fox noted Daktronics' attractive industry dynamics and exceptional products:



① DAKT IS A HIGH-QUALITY AND SECULAR GROWTH BUSINESS, SEVERELY UNDERVALUED BY THE MARKET TODAY

## Daktronics is a High-Quality Business

Daktronics' revenues are fueled by the expanding sports and live events market, advancements in LED technology, and a steady stream of replacement demand from a diverse base of thousands of customers.

| Attractive industry dynamics | Barriers to entry in the virtual display market are high: |
|---|---|
| DAKT has dominant market share (46%) in a fast-growing market.* | Relationship oriented direct sales network in Sports/Live Events is difficult to replicate. DAKT's steady maintenance revenues between orders provide consistent lines of dialogue with customers. |
| Replacement/upgrade demand drives majority of revenues. | Service quality and brand trust are paramount. Daktronics' scale gives them the ability to service key nation-wide accounts using their own employees, something overseas competition cannot offer. |
| Growing complexity of solutions, along with increasing software integration, should lead to industry consolidation, favoring the largest and most reputable players such as Daktronics. | Mission-critical investment requires choosing a trusted brand. |
| No significant customer concentration. | Niche market with high fixed costs relative to the size of the market. |

① DAKT IS A HIGH-QUALITY AND SECULAR GROWTH BUSINESS, SEVERELY UNDERVALUED BY THE MARKET TODAY

## Daktronics Makes Exceptional Products

For the largest, most advanced, and most spectacular video displays in the world, Daktronics is the industry standard.

For example, Daktronics is a supplier to:

**17** out of the **32** NFL teams
including **4** of the top **5** largest video displays

**16** out of the **30** MLB teams
including **3** of the top **5** largest video displays

(*See id.*, at 10–11.)

47.    Among other things, Alta Fox suggested that the Board implement key changes for improvement, including increased Board member accountability and better financial planning and pricing.

48.     With shareholder-driven leadership improvements, Alta Fox believes that Daktronics could stabilize EBIT margins and substantially grow its revenue.

49.     Defendant Kurtenbach, and the rest of the Board, however, have made it clear that they are not focused on benefitting all shareholders or the Company's long-term prospects. Instead, nepotism, a stagnant Board, and subpar leadership continue to cause Daktronics to underperform.  For example, Alta Fox previously introduced the Board to its preferred outside independent director with tremendous industry experience.  The independent director received glowing reviews following her interview with Board members, including Defendant Kurtenbach; nonetheless, the Board declined to contact her after the interview.  Breach Inlet described a similar situation in its December 17, 2024 press release, noting the Board's refusal to fairly evaluate Breach Inlet's proposed Board nominee, who was "more qualified than any member of the current Board."  (*See* Ex. C.)

50.     Moreover, in its presentation, Alta Fox explained that the Board and the named officers collectively own only approximately 5% of Daktronics' stock, and that 95% of Kurtenbach's compensation for fiscal year 2024 was paid in cash.  (*See* Ex. A, at 15.)  This ownership and compensation structure demonstrates a lack of incentive to drive shareholder value.

51.     To underscore the need for reform and call attention to growing concerns with Daktronics' nepotistic governance, Alta Fox collected a sample of employee reviews of Daktronics:

② LACK OF ACCOUNTABILITY & CULTURE OF COMPLACENCY HAVE RESULTED IN DAKT SIGNIFICANTLY UNDERPERFORMING ITS POTENTIAL

## Employee Reviews Support Alta Fox's Alignment Concerns

Don't just take our word for it – long tenured employees share our concerns.

| Date | Notable DAKT Employee Commentary | Employee Background |
|---|---|---|
| 11.7.24 | "Daktronics is a great organization, with a great product, but they are stuck in their old ways and not open to change… **The Kurtenbach family fills much of the leadership, and they became stagnant over the years from not listening to ideas and being open to change**. They are very rigid in their ways and the culture is not to travel and "see the world" which is pretty glamorous but **not much thought about being frugal**." | Former employee, more than 10 years |
| 9.27.24 | "Everyone at the C-Suite is related to the company's original founder, so nothing is ever going to change." | Former employee, tenure not disclosed |
| 11.24.23 | "**Middle management is stuck in their ways, which is bleeding the company dry by hiring more employees to do unnecessary data entry.** The answer is always to hire more people, opposed to automation… Most upper management seems to be related – nepotism runs strong." | Current employee, more than 10 years |
| 4.10.23 | "For anyone trying to advance their sales career, save your time. **There is an anti-sales culture. 0 upward mobility. No commissions or even any sort of concrete comp plan… Nepotism runs very deep.**" | Former employee, more than 5 years |
| 7.7.23 | "**No pay for performance.** Received a minuscule bonus (1 out of 4 years) based on a very subjective review. **Engineering rules the roost; sales is an afterthought.**" | Former employee, more than 3 years |
| 1.27.23 | "The company has many talented employees but **upper management is pretty bad.**" | Current employee, more than 5 years |

(*See* Ex. A, at 19.)

52.    Alta Fox also collected market data that further supports Alta Fox's suggestion for governance reform:

③ THE CASE FOR ADDING SHAREHOLDER REPRESENTATION TO DAKT'S BOARD

## Market Reactions Validate Alta Fox's Case

**The market has spoken:** it does not have faith in the BTO, it has low tolerance for further governance setbacks, and it welcomes shareholder-driven change.

| Announcement Topic | DAKT Share Price Day Movement | S&P 500 Average Price Day Movement | DAKT Relative Performance | Alta Fox's Interpretation of Market Reaction |
|---|---|---|---|---|
| 10.21.24 Business Transformation Office | 0.1% | -0.2% | **~0%** | • Investors are not assigning any credibility to the Board's transformation plan. The skepticism is unsurprising as the CEO is on the transformation committee. |
| 11.20.24 Reducing Poison Pill Threshold from 20% to 15% | (5.4)% | 0.0% | **~(5)%** | • DAKT's corporate governance discount grew *in real time*, and investors are increasingly asking the question of if they can continue to invest alongside this Board of Directors and management team. |
| 12.2.24 Alta Fox Files 13D Showing 11.7% Ownership in DAKT | 2.1% | 0.1% | **~2%** | • The market has welcomed Alta Fox's willingness to engage on behalf of all shareholders. |

**Shareholder activism is required to drive significant improvement to governance and strategic direction that will help eliminate DAKT's valuation discount, benefiting all shareholders.**

(*See id.*, at 21.)

53.     Finally, Alta Fox compared its proposed path forward with the status quo that Daktronics continues to safeguard:

④ THE ALTA FOX PATH TO $40+/SHARE

## Shareholders Have a Clear Opportunity to Choose Progress

| The Daktronics Status Quo | The Alta Fox Path Forward |
|---|---|
| • **Worst-in-class governance practices:** staggered Board, severely punitive (and recently made worse) "poison pill," and combined CEO/Chairman role. | • **A Shareholder-Friendly Board** with highly qualified, independent nominees and a history of driving excellent business performance. |
| • **Negligent nepotism:** 3 out of the 5 named "executive officers" are related family members. | • **Best-in-Class Governance Practices:** remove the staggered board, split the CEO/Chairman role, remove the poison pill, and establish compensation aligned with share price outperformance. |
| • **Complacent sales culture:** Daktronics has zero commissions for its sales staff because, "that's the way they have always done it." | • **Establish a merit-based culture:** employees succeed or fail at Daktronics based on the merits of their ideas and accomplishments, not on their last name. |
| • **Irresponsible financial stewardship** | |
| • **Unprofessional and confusing investor communications.** | • **Recruit a highly qualified CFO**, well incentivized to drive shareholder value. |
| • **Zero legitimate sell-side research coverage.** | |
| • **Lack of accountability for management or the Board:** | • **Institute accountability for management** initiating short-term and long-term guidance and a clear capital allocation strategy. |
|   ○ CFO was never fired and just transferred to a new role even 2+ years after the going concern. | • **Greater engagement with the investment community**, attendance at sought-after investor conferences, and a clear investor narrative aided by proper sell-side coverage. |
|   ○ CEO, Reece Kurtenbach, continues to operate unchecked from a Board that does not care and owns little stock.[1] | |
| DAKT Continues to Trade at a Material "Governance Discount" to Comps | DAKT Trades in-line or better than Comps with Accelerating Fundamentals |

(*See* Ex. A, at 26.)

54.     The Alta Fox presentation ultimately recommended several proposals to fix Daktronics' staggered Board and resulting mismanagement, including proposals to (1) nominate independent board members; (2) remove the staggered Board; (3) split the CEO and Chairman roles; and (4) remove Daktronics' poison pill.  (*See* Ex. A.)

55.     On information and belief, interpreting Alta Fox's presentation as a threat to the Board's own entrenchment—rather than constructive proposals to improve the Company—Daktronics issued a press release characterizing Alta Fox's presentation for improvements as an intimidation tactic.[18]

---

[18] Exhibit K, DAKTRONICS, *Daktronics Comments on Presentation and Public Statements from Alta Fox*, https://investor.daktronics.com/news-releases/news-release-details/daktronics-comments-presentation-and-public-statements-alta-fox.

56.     Alta Fox responded via its own press release the same day, explaining that "[a]s a shareholder, [Alta Fox] ha[s] an unassailable right to put up directors for election at an annual meeting and to call a special meeting of shareholders.  The Company's claim in its December 11th press release that [Alta Fox] tried to 'intimidate' the Board by stating [its] intention to nominate highly qualified, independent director candidates is not only false, but also speaks to the Board's extreme level of entrenchment and the insular culture it has perpetuated."[19]

**E.     Daktronics Attempts to Quickly Redomicile the Company to Avoid Shareholder Accountability and to Further Entrench the Board, While Preventing Alta Fox From Voting its Full Shares on the Measure**

57.     Alta Fox has continued to attempt to engage with the Board to enact governance reforms.  In all these discussions, however, the Board's proposals have been little more than window dressing. And those proposals have failed to provide any halfway-adequate response to the substantial number of shareholders unhappy with Daktronics' woeful governance.   For example, in discussions in December and January, Daktronics' representatives who were, on information and belief, guided at all times by the Board, offered proposed resolutions at ***below*** fair market value for the converted shares from the Note with little or ***no*** governance changes. Significantly, Daktronics' advisors also threatened to remove cumulative voting in an effort to thwart Alta Fox's push for Company reforms.

58.     On information and belief, in an effort to protect and further entrench itself, on January 21, 2025, the Board caused Daktronics to issue a preliminary proxy to solicit a shareholder

---

[19] Exhibit L, BUSINESS WIRE, *Alta Fox Corrects the Record Regarding Daktronics' Misleading Statements*, https://www.businesswire.com/news/home/20241211772129/en/Alta-Fox-Corrects-the-Record-Regarding-Daktronics%E2%80%99-Misleading-Statements.

vote to redomicile the Company in Delaware ahead of its next Board election in September 2025, when two of its eight directors will be eligible for reelection or replacement.[20]

59.     The Board recommended that shareholders vote in favor of reincorporating the Company in Delaware, despite the Company's decades-long presence and incorporation in South Dakota.  (*See* Ex. M.)  On information and belief, the Board members have never previously suggested reincorporating the Company in Delaware.

60.     As the Board revealed in the proxy itself, the principal purpose of reincorporating in Delaware is to remove the cumulative voting requirement to which it is subject in South Dakota. As mandated by South Dakota law, Daktronics' bylaws currently provide for cumulative voting in director elections and, on information and belief, they have provided for cumulative voting since the company's formation.  Though the proxy is not explicit on this point, on information and belief, the Board's reason for this move now is clear—to block Alta Fox and other stockholders from voting for new, independent directors to improve the Company, in an effort to continue its family-based, nepotistic management structure without regard to shareholder concerns.

61.     Although the Board's proxy claims that continued cumulative voting would "threaten[] the stability and continuity of the Company by empowering vocal minority shareholders to upset the will of the majority of shareholders," (Ex. M), on information and belief, the Board's true motivation for the stunt is to prevent Daktronics' *largest* shareholder, Alta Fox, from voting in new, independent directors to advance the Company.

---

[20] Daktronics' preliminary proxy statement is attached as Exhibit M.  It was also filed with the SEC and can be located here: https://www.sec.gov/Archives/edgar/data/915779/000091577925000046/formpre14a01172025.htm.

62. The Board's move to entrench its own interests and reduce stockholder rights to vote for new Board members, against the stockholders' own best interests, is a clear breach of fiduciary duty and an act of shareholder oppression.

63. At least two interrelated harms stem from this wrongful and inequitable conduct.

64. *First*, on information and belief, in calling a special meeting and approving the solicitation of votes in favor of redomiciling in Delaware for the purposes of entrenching themselves, the Board's action is wrongful altogether and should not occur.

65. *Second*, by lowering the poison pill threshold, setting a timeline for the Note to be converted by March 5, and then calling this special meeting vote ***now***, after Alta Fox had already indicated it was planning post-conversion to promptly call its own special meeting to de-stagger the Board and adopt other reforms, on information and belief, the Board is improperly trying to jump the gun, and get its own vote to occur ***first***, undermining Alta Fox's ability as a stockholder to implement needed reforms to improve the Company.

66. In addition to the above, Defendant Kurtenbach has since engaged in actions that could be considered soliciting votes before the Company's proxy is finalized, purportedly asserting to a group of employees (and therefore stockholders in the Company's 401(k) fund) at a townhall that the move "serves the interest of all shareholders." Defendants should not be allowed to engage in such antics.[21]

---

[21] The Company's bylaws permit the "record date" for any stockholder vote (*i.e.*, the date that determines which stockholders can vote) to be up to 70 days ***prior*** to the vote. In communications between counsel for Alta Fox and for Daktronics, Daktronics committed to setting the record date of the vote to redomicile such that Alta Fox is able to vote the full number of shares converted or to be converted under the Note. Should, contrary to that representation, the record date be set in such a way that Alta Fox is ***unable*** to vote all its shares, it reserves the right to seek further relief.

67.     As noted above, Alta Fox is not the only shareholder who has expressed concerns with Daktronics' rush to relocate to Delaware to remove cumulative voting.  Indeed, on February 4, 2025, Breach Inlet published an open letter to shareholders, stating that "the Board has taken steps to eliminate a valuable shareholder right" by attempting to reincorporate in Delaware, which Breach Inlet described as an "attempt[] to further entrench itself and the management team at the expense of shareholders."[22]

68.     In addition to the concerns expressed by Breach Inlet, Anchor Capital—a respected long-only, value-oriented investment management firm founded in 1983 with over $7 billion in assets and a fellow Daktronics shareholder—issued a press release on January 27, 2025, urging Daktronics to refrain from rushing its shareholder vote to reincorporate.  (Ex. D.)  In Anchor Capital's view, "it is important that Daktronics remain incorporated in South Dakota at this time – and consider moving to Delaware at a later date – to allow for swift shareholder-driven governance enhancements."  (*Id.*)  The firm "believe[s] reincorporating right now would diminish the voices of non-insider shareholders and stymie progress for positive changes backed by a number of top shareholders" and "view[s] the proposed enhancements mentioned above as highly beneficial to the Company, aligned with shareholders and essential to Daktronics' long-term success."  (*Id.*)

69.     Further, on January 22, 2025, independent investment firm Craig-Hallum Capital Group LLC issued an Equity Research report opining favorably on Alta Fox's attempts to improve Daktronics.   The  report  explained:  "In  December,  two  top  shareholders  began  pushing  for

---

[22] Exhibit N, BUSINESS WIRE, *Breach Inlet Capital Announces Intention to Vote Against Daktronics' Proposed Reincorporation*, https://www.businesswire.com/news/home/20250204698987/en/Breach-Inlet-Capital-Announces-Intention-to-Vote-Against-Daktronics%E2%80%99-Proposed-Reincorporation.

improvements in corporate governance, capital allocation, and shareholder engagement and accountability. Should some of these changes occur (e.g. forward guidance), we see the potential for a higher multiple in the stock."

70.    In sum, the Board nearly drove the Company to financial ruin in 2022 through continued reckless actions and poor governance. Against this backdrop, Alta Fox provided critical rescue financing and made every effort to work constructively with the Company, including agreeing to a lengthy 16-month standstill, during which it repeatedly sent private and constructive communications to the Board recommending obvious, best-practice changes. The Board either ignored Alta Fox's suggestions or did not respond at all.

71.    On information and belief, after over two years of Alta Fox's continued calls for change, the Board has forced the Company to take actions directly adverse to its largest shareholder. On information and belief, the Board is now trying to hastily redomicile to Delaware and eliminate cumulative voting before Alta Fox can call a special meeting. By doing so, the Board is attempting to deprive Alta Fox of its right to use cumulative voting to elect new, independent directors and to enact needed reforms.

72.    Allowing this blatantly self-serving maneuver to proceed unchecked would not only harm Alta Fox directly, but would also undermine the rights of all shareholders, sending a dangerous message that South Dakota boards can manipulate corporate machinery to entrench themselves without consequence. Permitting this type of preemptive, retaliatory governance maneuvering risks gutting the intent and effectiveness of South Dakota's long-standing stockholder protections—reducing the right to call a special meeting to little more than a theoretical safeguard, easily nullified whenever an entrenched board feels threatened.

73.    The Board's conflicted, improper actions to redomicile the Company in Delaware must be halted.  Such an injunction against this wrongful act should extend for a reasonable time period, and at the very least until the Company's annual meeting in September 2025.

## DERIVATIVE AND DEMAND FUTILITY

74.    Alta Fox brings this action directly, in recognition of the unique harm caused to it by the combination of the reduced poison-pill threshold and the ongoing conversion of its shares. But, in the alternative and to the extent the court concludes it is necessary, it also brings this action derivatively, for the benefit of Daktronics and all shareholders of Daktronics, to redress harm suffered by Daktronics, as well as to prevent future harm Daktronics is likely to suffer as a direct result of the Board's unlawful conduct alleged herein.  *See Noble ex rel. Drenker v. Shaver*, 583 N.W.2d 643, 647 (S.D. 1998) ("Landstrom was well within her right to plead for direct relief or in the alternative derivative relief 'should the trial court find it necessary.'").

75.    To the extent necessary, Alta Fox will adequately and fairly represent the interests of Daktronics in enforcing its rights, and has obtained competent counsel experienced in litigating complex shareholder, securities, and corporate management actions.

76.    This action is not a collusive action designed to confer jurisdiction on this Court that it would not otherwise have.

77.    Alta Fox is, and at all relevant times has been, an owner of Daktronics stock.

78.    Alta Fox has not made any demand on the Board to institute this action, since such demand would be a futile act.

79.    In particular, as a result of the facts set forth herein, demand on the Board to institute this action is not necessary because such a demand would be a futile act for the following reasons:

(a)     The Board has taken defensive measures against Alta Fox in an effort to maintain its staggered and entrenched Board, which defensive measures are subject to enhanced scrutiny because the Board is acting based on its own self-interested motives, rather than in the interest of Daktronics and its shareholders.

(b)     In taking such unreasonable measures, the Board demonstrated its principal desire to retain unfettered control of Daktronics.  Under such circumstances, there exists more than reasonable doubt as to the disinterestedness of the Board.

(c)     Daktronics' Board approved the poison pill, announced an accelerated special meeting of stockholders, and recommended to approve reincorporation in Delaware, as well as other actions described above.  This action seeks to invalidate the accelerated shareholders special meeting and/or to cause it to be rescinded; therefore, if the Board were to allow Daktronics to bring suit seeking such recovery, the Board would, in essence, be ordering itself to undo its own actions.  Under these circumstances, demand is futile.

(d)     The Board approved and/or permitted the misconduct alleged herein, and as such, the Board is not comprised of disinterested parties.

## COUNT I
### Breach of Fiduciary Duty

80.     Alta Fox repeats and realleges all paragraphs above as if fully set forth herein.

81.     Alta Fox brings this claim on behalf of itself directly, and, in the alternative, derivatively on behalf of Daktronics, Inc.

82.     Defendant Kurtenbach, as President, as CEO, and as a member and Chairman of the Board, owes certain fiduciary duties to all Daktronics shareholders, including Alta Fox.

83.   By the acts and conduct alleged herein, Defendant Kurtenbach and the Board members acting in concert with him have failed to exercise due care and have breached the duties of loyalty, good faith, and candor owed to Alta Fox by, among other things (1) placing the Board's own interests above those of Daktronics' shareholders, including Alta Fox; (2) failing to maximize shareholder value; (3) utilizing unreasonable defensive measures to entrench theirs position, including proposing to eliminate shareholders' cumulative-voting rights and lowering Daktronics' poison pill threshold; and (4) unreasonably scheduling an accelerated special meeting to further entrench the Board.

84.   Unless enjoined by this Court, Defendant Kurtenbach and the Board members acting in concert with him will continue to breach the fiduciary duties owed to Alta Fox and its fellow shareholders, resulting in irreparable harm to Alta Fox, to the Company's shareholders, and to the Company itself.

85.   Absent injunctive relief, Alta Fox will also suffer harm particularized to it as a consequence of this breach, because the timeline for the accelerated special meeting will have the effect of depriving Alta Fox of the ability to pursue the governance reforms it has championed, which it would otherwise be entitled to do.

86.   Alta Fox has no adequate remedy at law to prevent the accelerated special meeting to reincorporate and the shareholder oppression resulting therefrom.

## COUNT II
## Shareholder Oppression

87.   Alta Fox repeats and realleges all paragraphs above as if fully set forth herein.

88.   Alta Fox brings this claim on behalf of itself directly, and, in the alternative, derivatively on behalf of Daktronics, Inc.

- 28 -

89.     Central to Alta Fox's decision to invest in Daktronics was its understanding that it would have the indirect right to make its voice heard in matters of corporate governance and that, consistent with the Company's bylaws and South Dakota statutory and constitutional law, it would have the opportunity to do so by means of voting for directors using cumulative voting.

90.     In furtherance of that premise, Alta Fox gradually acquired additional shares in Daktronics, to the point that it is now the Company's largest shareholder.

91.     Alta Fox further expected that, should the issue of cumulative voting ever come to a shareholder vote, it would be entitled to vote the entirety of its beneficially-owned shares in favor of preserving the cumulative-voting regime, as well as in enacting other reforms at the Company by calling its own special meeting or otherwise making proposals.

92.     The Defendants were aware, or at least should have been aware, that Alta Fox invested in Daktronics based on the expectations outlined above.

93.     Alta Fox's expectations were reasonable under the circumstances and in the broader context of the relationship between it and Daktronics.

94.     The Defendants, in concert with one another and the remaining members of the Board, have proposed (1) eliminating cumulative voting and (2) submitting the matter to a shareholder vote on an unreasonably abbreviated timeline.

95.     The Defendants, in concert with one another and the remaining members of the Board, have proposed this course as a means of insulating the current constitution of the Board in future elections from challenges from noncontrolling shareholders, including Alta Fox, rather than as a means of responding to a legitimate threat to the business.

4918-8692-6870, v. 1

96.    By this conduct, the Defendants, in concert with one another and with the remaining members of the Board, have substantially defeated Alta Fox's reasonable expectations and thereby have engaged in oppressive conduct against Alta Fox.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against Defendants:

a.    Preliminarily and permanently enjoining Defendants and those acting in concert with them from setting a record date and holding an accelerated special meeting to vote on reincorporation from South Dakota to Delaware, and from soliciting votes and proxies in connection with that meeting, for such time as the Court deems just and proper;

b.    Preliminarily and permanently enjoining Defendants and those acting in concert with them from interfering with Alta Fox calling any special meeting or offering proposals at any special meeting of the stockholders;

c.    Awarding Plaintiff its reasonable fees, costs, and expenses in this action;

d.    Awarding any applicable pre- and post-judgment interest on all awards of fees, costs, and expenses; and

e.    Awarding such other relief as the Court deems just and proper.

4918-8692-6870, v. 1

Dated:  February 4, 2025

Respectfully submitted,

ALTA FOX OPPORTUNITIES FUND, LP,
on behalf of itself and, in the alternative,
derivatively on behalf of DAKTRONICS,
INC.,

By its attorneys,

Tim R. Shattuck
Drew A. Driesen
Woods, Fuller, Shultz & Smith P.C.
PO Box 5027
300 South Phillips Ave, Suite 300
Sioux Falls, SD  57104
Tel: (605) 978-0614
Fax: (605) 339-3357
tim.shattuck@woodsfuller.com
drew.driesen@woodsfuller.com

Tucker DeVoe (*pro hac vice forthcoming*)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA  02210
Tel: (617) 570-1000
Fax: (617) 523-1231
tdevoe@goodwinlaw.com

Kelsi Quarles (*pro hac vice forthcoming*)
GOODWIN PROCTER LLP
601 South Figueroa Street, Suite 4100
Los Angeles, CA 90017
Tel: (213) 426-2596
Fax: (213) 623-1673
kquarles@goodwinlaw.com

## **VERIFICATION**

STATE OF TEXAS                )
                                                      :SS
COUNTY OF Tarrant )

I, P. Connor Haley, Managing Partner of Alta Fox Opportunities Fund, L.P., being first duly sworn on oath, state that I have read the within and foregoing Verified Complaint and state that the same is true and correct to the best of my knowledge, including based upon reasonable investigation.

P. Connor Haley
P. Connor Haley

Subscribed and sworn to before me
this 4 day of February, 2025.

Notary Public – Texas
My commission expires: 2.13.2029

JANIE WIDMAN
Notary Public, State of Texas
Comm. Expires 02-13-2029
Notary ID 129305633

JS 44   (Rev. 11/15)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| Alta Fox Opportunities Fund, LP | Daktronics, Inc., Reece A. Kurtenbach |

| | | |
|---|---|---|
| **(b)**  County of Residence of First Listed Plaintiff   Tarrant County, TX | | County of Residence of First Listed Defendant   Brookings County, SD |
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | | NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |
| **(c)**  Attorneys *(Firm Name, Address, and Telephone Number)*<br>Timothy Shattuck, Woods Fuller Shultz & Smith, P.C.<br>300 S Phillips Ave. Ste 300, Sioux Falls, SD 57104 (605) 336-3890 | | Attorneys *(If Known)* |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government Plaintiff
- ☐ 2   U.S. Government Defendant
- ☐ 3   Federal Question *(U.S. Government Not a Party)*
- ☒ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☒ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act<br><br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | ☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original Proceeding   ☐ 2  Removed from State Court   ☐ 3  Remanded from Appellate Court   ☐ 4  Reinstated or Reopened   ☐ 5  Transferred from Another District *(specify)*   ☐ 6  Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332(a)(1)

Brief description of cause:
Plaintiff alleges claims for breach of fiduciary duty and shareholder oppression.

| VII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P. | DEMAND $ | CHECK YES only if demanded in complaint: JURY DEMAND:   ☐ Yes   ☒ No |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY | *(See instructions):* | JUDGE | DOCKET NUMBER |
|---|---|---|---|

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 02/04/2025 | /s/ Tim R. Shattuck |

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|

JS 44 Reverse (Rev. 11/15)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a)   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b)   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c)   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. **(See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

III.   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.   **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.   **Origin.** Place an "X" in one of the six boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

VI.   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

VII.   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.